ORDERED.

Dated: September 29, 2015

_____
Jerry A. Funk
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:                                                                                  Case No. 3:14-bk-4699-JAF

NICHOLS CREEK DEVELOPMENT, LLC                          Chapter 11

  Debtor.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case came before the Court upon Creditor, WHITNEY BANK, f/k/a HANCOCK BANK's ("Hancock")[1] Verified Motion to Dismiss Case or, Alternatively, Grant Relief from the Automatic Stay (Doc. 32). The Court conducted an evidentiary hearing on the matter on August 24, 2015. The parties stipulated to a number of facts. In addition, Hancock presented the testimony of a witness.

Debtor does not object to dismissal of the case. However, creditor, STOKES

---

[1] Effective March 31, 2014, Hancock Bank's name changed to Whitney Bank.

1

HOLDINGS, LLLP ("Stokes"), objects to dismissal of the case and requests that it be converted to a case under Chapter 7. Accordingly, the only issue before the Court is whether to dismiss the case or convert the case to Chapter 7. The Court elected to take the matter under advisement.

**Stipulated Facts**

Hancock and Stokes stipulated to the following facts. On September 26, 2014, Debtor filed its Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code. (Doc. 1). On October 29, 2014, the 341 Meeting of Creditors was held. Ricky Mitchell attended the 341 Meeting as the corporate representative of Debtor. [Doc. 29, p. 3, lines 19-21].

Debtor is a Florida limited liability company, whose single real estate asset is the Nichols Creek Property (the "Property") (described in the Summary and Schedules as the New Berlin Court property). [Doc. 1, Schedule A, Doc. 29, p. 13, lines 19-22; Doc. 30, p. 11, lines 23-25 to p. 12, lines 1-2]. Debtor did not indicate in its Voluntary Petition that the nature of its business is a "Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)." [Doc 1, Voluntary Petition]. Debtor claimed that the nature of its business was "Other." [Doc. 1, Voluntary Petition].

The Property is the sole real estate asset of Debtor. [Doc. 1, Schedule A; Doc. 5, Item VII; Doc. 29, p. 13: lines 19-22; Doc. 30, p. 11, lines 23-25 to p. 12, lines 1-2]. Debtor's schedules list two bank accounts with a small amount of cash totaling $3,456.93. [Doc. 1, Schedule B]. Debtor owns no other property.

Debtor has no unsecured creditors. [Doc. 1, Schedule E]. Debtor had no sources of income in 2014. [Doc. 1, Statement of Financial Affairs, Doc. 5, Item V; Docs. 14, 19, 26,

and 27]. Debtor has had de minimis income in 2015. Debtor has no employees. [Doc. 5, Item VIII; Docs. 14, 19, 26, and 27]. Debtor has no business, as it simply owns the Property, which does not generate any real income.

Hancock is a secured creditor of Debtor and holds a first priority mortgage on the Property. On or about December 7, 2006, Debtor executed and delivered to Peoples First Community Bank ("Peoples First") a Real Estate Promissory Note in the original principal amount of $6,000,000.00 (the "Note"). To secure payment of the Note, Debtor and Hill Street[2] executed and delivered to Peoples First the Mortgage, which was recorded on December 15, 2006, in the Public Records of Duval County, Florida. On December 31, 2008, Debtor executed and delivered to Peoples First the Renewal Note in the original principal amount of $5,999,995.93. On September 30, 2009, Debtor executed and delivered to Peoples First a Modification of Note Agreement (the "Note Modification"), which extended the maturity date of the Renewal Note and changed the rate of interest charged under the Renewal Note. The Cross Default Agreement dated September 30, 2009 was executed and delivered by both Debtor and Hill Street to Peoples First, and was recorded on October 15, 2009, in the Public Records of Duval County, Florida. The Cross Default Agreement (and the Mortgage) secured amounts due related to debt owed to Hancock by Hill Street.

On December 18, 2009, the Office of Thrift Supervision closed the operations of Peoples First, and appointed the Federal Deposit Insurance Corporation ("FDIC") as the receiver of Peoples First. In accordance with Florida law and the Federal Deposit

---

[2] The parties provided no explanation in their stipulation as to the identity of Hill Street or its relationship to Debtor. However, according to Debtor's schedules, Hill Street, LLC owns a 10% interest in Debtor. (Hancock's Ex. 4).

3

Insurance Act, 12 U.S.C § 1821 *et. seq.* (the "FDIC Act"), the FDIC was empowered to liquidate the assets of Peoples First in order to wind down the affairs of Peoples First. On December 18, 2009, in accordance with that certain Purchase and Assumption Agreement (Modified Whole Bank, All Deposits) dated December 18, 2009, by and between the FDIC, as Receiver of Peoples First, and Hancock, the FDIC sold certain assets of Peoples First, including the loan and loan documents at issue in this action, to Hancock. The FDIC's assignment of the loan documents at issue in this action to Hancock is evidenced by that certain Assignment of Note, Mortgage, and Loan Documents effective December 18, 2009, and recorded in the Public Records of Duval County, Florida on August 30, 2010 (the "Loan Assignment"). As a result of the Loan Assignment, Hancock is the owner and holder of the Note, Mortgage, Renewal Note, Note Modification, Cross Default Agreement, and Extension Agreement, and is entitled to enforce same.

On or about October 29, 2010, Debtor executed and delivered to Hancock a Short-Term Maturity Extension Agreement ("Extension Agreement"), which further extended the maturity date of the Renewal Note to December 1, 2010. Debtor defaulted under the terms of the Renewal Note, as modified and extended, and Debtor and Hill Street defaulted under the Mortgage, by failing to pay to Hancock all amounts due at the scheduled maturity on December 1, 2010.

As a result of the default, Hancock initiated foreclosure proceedings in the United States District Court for the Middle District of Florida, Jacksonville Division, bearing case number 3:13-cv-26 (the "Foreclosure Action"), in January of 2013. The Honorable Timothy J. Corrigan is presiding over the Foreclosure Action. In the Foreclosure Action, Hancock seeks damages in excess of $9,700,000.00 from Debtor and guarantors under the

Renewal Note and written guaranties. The Renewal Note is secured by the Mortgage, which Hancock seeks to foreclose in the Foreclosure Action. Because there are junior mortgages against the Property, Hancock also seeks to foreclose the interests evidenced by the junior mortgages in the Foreclosure Action.

On July 31, 2014, Judge Corrigan heard oral argument on various motions for summary judgment in the Foreclosure Action, including Hancock's motions for summary judgment. At the conclusion of the hearing, Judge Corrigan advised that he would issue an order on the motions for summary judgment in due course. To date, Judge Corrigan has not ruled on the pending motions for summary judgment because of Debtor's bankruptcy filing.

Between the date of default and the date the Foreclosure Action was filed, Debtor planned to lease or sell a portion or all of the Property to repay Hancock. [Doc. 30, p. 44, lines 7-12]. In the Foreclosure Action, Debtor sought eighteen (18) to twenty-four (24) months to try to sell the Property. [Doc. 30, p. 51, lines 4-10].

Debtor filed for bankruptcy to delay the Foreclosure Action rather than to reorganize. [Doc. 29, pp. 29, lines 8 through 30, line 3; Doc. 30, p. 57, lines 19-23]. The timing of Debtor's Petition indicates an intent to frustrate a secured creditor's efforts to enforce its rights. At the 341 Meeting, Mr. Mitchell testified that "once we got to the point where [Hancock] would not negotiate with [Debtor] any further, [Debtor], . . . we had no other option but to file Chapter 11." [Doc. 29, p. 7, lines 15-25; s*ee also,* Doc. 30, p. 57, lines 19-23]. When asked at the 341 meeting what Debtor could afford to pay per month under a plan of reorganization, Mr. Mitchell testified Debtor "[doesn't] have any money," and Debtor "can't afford to pay anything." [Doc. 29, p. 29, lines 8-12].

On January 9, 2015, Hancock filed two Proofs of Claim. One Proof of Claim sets forth that the amounts due to Hancock from Debtor under the Renewal Note and related documents equaled $11,219,396.73 as of January 12, 2015. [Claim No. 4-2]. The amounts claimed under Claim No. 4-2 as of the Petition Date totaled $10,718,580.09. [Claim No. 4-2]. The second Proof of Claim sets forth that the amounts due to Hancock from Debtor under the Mortgage and Cross Default Agreement and related documents equaled $4,244,458.82 as of January 12, 2015. [Claim No. 5-2]. The amounts claimed under Claim No. 5-2 as of the Petition Date totaled $8,680,438.35. [Claim No. 5-2].[3]

Debtor claims in its Schedules that six creditors besides Hancock hold secured claims. [Doc. 1, Schedule D]. One of the six creditors is the Duval County Tax Collector. [Doc. 1, Schedule D]. However, since 2010 Hancock has paid $600,068.81 in property taxes related to the Property. [Claim No. 4-2].

Stokes is one of the other six alleged secured creditors. [Doc. 1, Schedule D]. Debtor claims that Stokes is owed $1,500,000.00, and that Stokes holds a second mortgage on the Property. [Doc. 1, Schedule D]. Stokes has filed a Proof of Claim. [Claim No. 3].

Debtor claims in its Schedules that the other four secured creditors, Hawkins Avenue Corp. ("Hawkins"), R2S, LLC ("R2S"), F&M Rental, LLC ("F&M"), and JD Mitchell Irr. Trust ("JD Mitchell"), hold mortgages on the Property which are subordinate to Hancock and Stokes. [Doc. 1, Schedule D]. However, J.D. Mitchell and F&M Rental do not actually hold mortgages on the Property. [Doc. 30, p. 13, lines 10-20].

Hawkins, R2S, F&M, and JD Mitchell are either insiders or affiliates of Debtor. Hawkins and R2S are two of the owners of Debtor. [Doc. 1, Statement of Financial Affairs].

---

[3] An itemized statement attached to Claim 5-2 indicates that Hancock recovered real property valued at $4,400,000.00 post-petition.

6

F&M and JD Mitchell are affiliates of Debtor. [Doc. 1, Schedule D and Schedule H]. F&M and J.D. Mitchell did not file a Proof of Claim.

Mr. Mitchell is the manager of F&M, which is owned by his father, J.D. Mitchell. [Doc. 29, pp. 22, lines 24-25; 23, lines 3-14; 25, lines 11- 13]. Mr. Mitchell is also the trustee of JD Mitchell [Doc. 29, pp. 22, lines 24-25; 23, lines 3-14; 25, lines 11-13], which is a shareholder of Hawkins.

Debtor has not been able to refinance the Property and has no money to pay off Hancock and its other creditors. [Doc. 29, pp. 28, line 25 through 29, line 2; 29:lines 8-12].

Hancock's Appraisal dated May 20, 2014 values the Property at $12,250,000.00. (Hancock's Ex. 9). Stokes' Appraisal dated October 16, 2013 values the Property at $14,090,000.00. Debtor's Appraisal dated January 21, 2015 values the Property at $24,000,000.00.

### Testimony at the Hearing

Robert Gatlin testified on behalf of Hancock. Mr. Gatlin is employed by CBRE, Inc., a vertically integrated real estate company, as a first vice president. Mr. Gatlin works as a commercial real estate broker, focusing on industrial related properties. Mr. Gatlin became involved with Debtor when he obtained a buyer to purchase the Property one and a half to two years ago. However, the sale did not occur. On October 31, 2014, Debtor filed an application seeking to retain Mr. Gatlin as a real estate agent for the estate which the Court approved by order dated December 3, 2014. During the eight to nine month period Mr. Gatlin had a listing agreement for the Property with a sales price of $15,000,000.00 to $16,500,000.00, there was some interest in the Property. However, he did not receive any

offers. Mr. Gatlin testified that he may have a viable prospect to purchase the Property and hopes that an offer will be submitted in one to two months. Mr. Gatlin does not currently have a listing agreement with Debtor.

### **Conclusions of Law**

Under § 1112(b) of the Bankruptcy Code, a bankruptcy court shall dismiss a Chapter 11 case or convert a Chapter 11 case to Chapter 7, whichever is in the best interests of creditors and the estate, for cause, unless the court determines that the appointment of a trustee of examiner is in the best interests of the creditors and the estate. 11 U.S.C. § 1112(b). Debtor does not dispute that cause exists to dismiss the case. Accordingly, the sole issue before the Court is whether conversion or dismissal is in the best interests of creditors and the estate. Whether dismissal or conversion is appropriate is a question "left to the sound discretion of the bankruptcy court." In re New Towne Dev., LLC, 404 B.R. 140, 146 (Bankr. M.D. La. 2009)(quotation omitted).

Stokes urges the Court to consider the value of the Property and what can be obtained by the creditors. Stokes asserts that Hancock's appraisal is not reliable because it only included 188.12 acres instead of the Property's actual 270 acres and also considered the Property as two separate parcels rather than one contiguous parcel. Stokes argues that if the Property is sold for $24,000,000.00, the value asserted by Debtor's appraisal, secured claims will be paid in full. However, Stokes recognizes that such a sale is unlikely. Instead, Stokes points out that Debtor has two pending objections to claims which would, if successful, lower the amount owed to Hancock by $8,000,000.00. In that scenario, a sale of the Property for $16,000,000.000 would result in the creditors being paid in full. Stokes urges the Court to give Mr. Gatlin additional time to close a sale in order to realize that

outcome. Such an outcome is optimistic to say the least. The Property has been on the market for at least two years and a sale has not occurred. Additionally, during the 8-9 months that Mr. Gatlin had a listing agreement for the Property with a sales price of $15,000,000.00 to $16,500,000.00, he did not receive any offers to purchase the Property.

Converting the case to Chapter 7 would only further delay Hancock's ability to collect what it is owed after having been held at bay for almost five years. Aside from the additional delay, there is no money to market the Property and a Chapter 7 trustee can do no more than Debtor has already done or attempted to do. While it is true that dismissing the case will result in the eventual extinguishment of Stokes' lien if a foreclosure sale of the Property occurs, Stokes has the ability to protect itself by paying off Hancock. The Court finds that dismissal rather than conversion is in the best interests of the creditors and the estate and will enter a separate order dismissing the case.